IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DELANA GALE FLIPPO                                           PLAINTIFF

V.                            CASE NO. 3:16-CV-03120

NANCY A. BERRYHILL, Commissioner
Social Security Administration                                   DEFENDANT

## MEMORANDUM OPINION AND ORDER

Plaintiff Delana Gale Flippo brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I. BACKGROUND

Plaintiff filed her applications for DIB and SSI on January 22, 2013, alleging an onset date of April 2, 2012, due to breast cancer unknown stage, high blood pressure, depression, degenerative disc disease, left knee torn anterior cruciate ligament ("ACL"), right knee, right shoulder, right hip, left arm, and left hand conditions. (Doc. 10, pp. 119, 136, 157-58, 165, 174-75). Based on her work credits, the Commissioner determined that the Plaintiff met the insured status requirements of the Act through March 31, 2017. *Id.* at 274-75.

1

Plaintiff's application was denied at both the initial and reconsideration levels. An administrative hearing was held on May 6, 2015. The Plaintiff was present and represented by counsel. *Id.* at 86-106. Following the hearing, an administrative law judge ("ALJ") entered an unfavorable decision on November 3, 2015. *Id.* at 61-74.

The ALJ concluded that Plaintiff's carpal tunnel syndrome ("CTS"), degenerative joint disease of the left knee and right shoulder, degenerative disc disease ("DDD") of the cervical and lumbar spine, mild hearing loss, anxiety, and major depressive disorder were severe, but they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* at 63-66. The ALJ found Plaintiff capable of performing sedentary work, except that she can only reach overhead occasionally, and she can perform only simple tasks with simple instructions. *Id.* at 66.

At the time of the administrative hearing held on May 6, 2015, Plaintiff was 41 years of age and had obtained a general equivalency diploma. *Id.* at 92-93. Plaintiff's past relevant work consisted of working as a cashier, caregiver, and certified nursing assistant. *Id.* at 72-73. With the assistance of a vocational expert, the ALJ determined Plaintiff could perform work as a document preparer, escort vehicle driver, and small product assembler. *Id.* at 74.

Plaintiff requested a review of the hearing decision by the Appeals Council, and the request was denied on October 6, 2016. *Id.* at 7-13. Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have submitted appeal briefs to the Court, *see* Docs. 11, 12, and the case is now ready for decision. The Court has carefully reviewed the entire transcript and repeats the facts and arguments presented in the parties' briefs only to the extent necessary to provide context to the final decision.

Plaintiff's medical conditions are supported by various medical reports in the record. The reports indicate that on February 22, 2012, Plaintiff presented to Dr. Tarik Sidani, D.O., because she injured her left knee getting out of bed two months earlier. (Doc. 10, pp. 429, 502). Plaintiff reported that taking anti-inflammatories and pain medication provided her with little relief. *Id.* Dr. Sidani ordered a left knee magnetic resonance imaging ("MRI") study. *Id.*

On March 1, 2012, Dr. Sidani reviewed Plaintiff's MRI study, and he did not see any specific meniscus pathology. *Id.* at 428, 430. The left knee MRI study showed early osteoarthritis with small effusion. *Id.* at 430, 494. Dr. Sidani then administered a combination Kenalog and Marcaine steroid injection, and noted that if the pain continued, an arthroscopy would be recommended. *Id.* at 428, 501.

On June 25, 2012, Plaintiff reported that the steroid injection helped her pain, but she continued to have mechanical symptoms that caused her to fall on a couple of occasions. *Id.* at 428. Dr. Sidani scheduled Plaintiff for surgery, but he cautioned that it might be a purely diagnostic procedure. *Id.* On July 3, 2012, Plaintiff underwent a left knee arthroscopy with abrasion chondroplasty. *Id.* at 432-33, 506-07. Surgical pathology showed left knee arthroscopic debridement. *Id.* at 508. Then, on July 19, 2012, Plaintiff presented to the emergency department of North Arkansas Regional Medical Center ("NARMC") with extreme left knee pain, and she was prescribed Norco. *Id.* at 509-11.

On July 25, 2012, Plaintiff returned to Dr. Sidani three weeks after the left knee arthroscopy and complained of severe knee pain. *Id.* at 427. Dr. Sidani recommended Plaintiff get off crutches, weight bear as tolerated, wean off pain medication, and

participate in formal physical therapy. *Id.* On September 24, 2012, Plaintiff reported that her knee had not stopped hurting since the surgery. *Id.* at 442. Dr. Victor Armstrong, D.O., suggested that Plaintiff obtain a second orthopedic opinion. *Id.* Plaintiff's Celexa prescription was changed to Prozac at that time, due to possible side effects. *Id.* at 443.

On October 30, 2012, Dr. D. Wayne Brooks, M.D., wrote in his records that he had managed Plaintiff's chronic pain for a couple years. *Id.* at 427. Dr. Brooks noted that Plaintiff had been doing very well with oral pain medications. *Id.* Plaintiff's medication included Oxycodone, along with Clonazepam for muscle spasms and anxiety. *Id.* at 434.

On March 5, 2013, Plaintiff reported having back pain and a burning sensation in the left lower extremity and buttock area, and she also complained that her Prozac prescription was not working as well. *Id.* at 448. Upon examination, Plaintiff's gait was found to be within normal limits. Dr. Armstrong started Plaintiff on Effexor and tapered the Prozac. *Id.* Oxycodone was also prescribed, and a lumbar spine MRI study was ordered. *Id.* at 448-49.

On March 20, 2013, a review of the lumbar spine MRI study revealed a small disc herniation at L5-S1. *Id.* at 450, 516. Plaintiff reported that Effexor was helping a lot with her depressive disorder. *Id.* at 450. On May 22, 2013, Plaintiff presented to the emergency department of NARMC and reported difficulty taking a deep breath. *Id.* at 594-602. Plaintiff was diagnosed with chest wall pain and anxiety. *Id.* at 597.

On July 2, 2013, a right shoulder MRI study revealed calcification along the superolateral border of the supraspinatus tendon, consistent with calcific tendonitis. *Id.*

at 603. The study also showed mild degenerative change in the acromioclavicular joint with a little bit of superior spurring, but no inferior spurring or impingement. *Id.*

On August 2, 2013, state agency medical consultant, Dr. Alice M. Davidson, M.D., completed a Physical Residual Functional Capacity Assessment at the initial level. *Id.* at 145-47. Dr. Davidson determined that the medical record supported a light RFC with postural restrictions. *Id.* at 147. More specifically, Dr. Davidson found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and occasionally could balance, stoop, knee, crouch, or crawl. *Id.* at 146.

On October 7, 2013, Dr. W. Charles Nichols, Psy.D., performed a Mental Diagnostic Evaluation. *Id.* at 535-40. Plaintiff was diagnosed with major depressive disorder, with a Global Assessment of Functioning score of 50-55. *Id.* at 539. Dr. Nichols determined that Plaintiff was moderately impaired as to her activities of daily living ("ADLs"), with regard to self-care, social interaction, and domestic skills. *Id.* Plaintiff's capacity to interact and communicate with others was deemed "adequate." *Id.* Plaintiff's cognitive abilities and mental efficiency were deemed "average." *Id.* Dr. Nichols noted that there were no signs of impulsivity, restlessness, and hyperactivity during Plaintiff's examination, and she was likely to be able to complete simple or job-like tasks with adequate pace on most days, but during significant depressive content episodes, she might have difficulty persisting with tasks within an acceptable time frame. *Id.* Plaintiff was also found to be able to manage funds without assistance. *Id.* at 540.

On December 19, 2013, state agency medical consultant, Dr. Abesie Kelly, Ph.D., completed a Psychiatric Review Technique ("PRT") at the initial level. *Id.* at 143-

44. Dr. Kelly cited Listing 12.04, "affective disorders," as the listing he relied upon in conducting the analysis. *Id.* at 144. He determined that Plaintiff had mild limitations with activities of daily living, moderate limitations with social functioning, and moderate limitations maintaining concentration, persistence, or pace. *Id.* No episodes of decompensation were noted. *Id.* Dr. Kelly also completed a Mental Residual Functional Capacity Assessment at the initial level. *Id.* at 147-49. Dr. Kelly assessed Plaintiff as being able to perform unskilled work—meaning work where interpersonal contact was incidental to work performed, such as assembly work. She could also perform work where the complexity of tasks was learned and performed by rote and consisted of few variables, with little need for judgment. Plaintiff could also perform tasks in which the level of supervision required was simple, direct, and concrete. *Id.* at 149.

On January 1, 2014, Plaintiff presented to the emergency department of NARMC, and complained of shoulder pain that woke her up at night. *Id.* at 623-31. Plaintiff's right shoulder examination and X-ray were normal. *Id.* at 626. She was diagnosed with right shoulder pain and prescribed Flexeril and Ultram. *Id.* at 627.

On April 11, 2014, state agency medical consultant, Dr. Jerry R. Henderson, M.D., affirmed Dr. Kelly's PRT analysis and mental RFC assessment at the reconsideration level. *Id.* at 182-83, 186-88. On the same date, state agency medical consultant, Dr. Janet Cathey, M.D., affirmed Dr. Davidson's physical RFC assessment at the reconsideration level. *Id.* at 184-86.

On December 11, 2014, Plaintiff underwent a left upper extremity electromyogram/nerve conduction study ("EMG/NCS"). *Id.* at 654-55. Plaintiff had a

previous right CTS release and right shoulder repair surgery, but she denied recurrent right-sided symptoms. *Id.* at 654. The EMG/NCS revealed a mildly severe compromise of the left median nerve through the carpal tunnel, with focal motor or sensory demyelination. *Id.* at 655. The study was unremarkable for focal lesions of the left ulnar or radial nerves, and it was also unremarkable for significant radiculopathic process involving the mid- to lower-cervical or upper-thoracic levels. *Id.*

On February 3, 2015, Dr. Thomas Knox, M.D., diagnosed Plaintiff with CTS of the left hand after the NCS confirmed the diagnosis. *Id.* at 691-93. No evidence of radiculopathy was noted on the EMG/NCS. *Id.* at 692. Dr. Knox recommended an endoscopic carpal tunnel release of the left hand. *Id.* On February 11, 2015, Dr. Knox performed that surgical procedure. *Id.* at 694-95.

On February 12, 2015, a cervical spine MRI study revealed that Plaintiff had moderate cervical spondylosis, with the worst level at C6-C7, with right-sided neuroforaminal narrowing. *Id.* at 661-63. There was also a moderate central disc osteophyte complex at C5-C6, and a small left-sided osteophyte complex at C4-C5. *Id.*

On February 24, 2015, Plaintiff visited Dr. Knox for a two-week follow-up visit after her left carpal tunnel surgery. *Id.* at 696. She noted that she experienced only occasional pain in the operated hand, was healing well, and was scheduled to begin outpatient hand therapy. *Id.*

On April 22, 2015, Plaintiff visited Dr. Brent Weilert, M.D., and reported constant episodes of severe bilateral posterior neck pain. *Id.* at 667-69. Dr. Weilert diagnosed Plaintiff with cervical stenosis of the spine and cervical radiculopathy. *Id.* at 668. Dr. Weilert administered a cervical epidural steroid injection. *Id.* at 668-69. Then, on May 8,

2015, Plaintiff underwent a bilateral EMG/NCS due to chronic neck and arm pain. *Id.* at 657-61. Dr. George W. Deimel, M.D., noted that there was EMG evidence of mild on the right, and moderate on the left, median mononeuropathies at the wrist, and that these findings were consistent with a diagnosis of CTS. *Id.* at 660.

On June 23, 2015, Dr. Ahmad Al-Khatib, M.D. conducted a neurological consultative examination. *Id.* at 685-86. Plaintiff's hearing was found to be diminished on the left side, and deep tendon reflexes were at grade 2/2 throughout. Her plantar responses were down, going bilaterally, and there was evidence of tenderness in both shoulders. *Id.* at 686. Examination of the spine revealed evidence of tenderness over the cervical and lumbosacral spinal regions. *Id.* Plaintiff had diminished pinprick and light sensation over the left upper extremity and an antalgic gait. *Id.* Dr. Al-Khatib diagnosed Plaintiff with possible cervical radiculopathy; possible lumbosacral radiculopathy; left hearing loss; and chronic headaches with cervicogenic, tension, and migrainous features. *Id.* Dr. Al-Khatib recommended further EMG/NCS testing for upper and lower extremities bilaterally to evaluate the possible diagnoses. *Id.* He opined that Plaintiff had moderate limitations in standing, walking, carrying, handling objects, and hearing. *Id.*

On June 26, 2015, Dr. Shannon H. Brownfield, M.D., conducted a physical consultative examination of Plaintiff. *Id.* at 679-83. Plaintiff reported to Dr. Brownfield that her medications included Percocet, Clonazepam, Lisinopril/HCTZ, Celexa, and Imitrex. *Id.* at 679. Dr. Brownfield determined that Plaintiff had a reduced range of motion in her shoulders due to pain, and a reduced range of motion and pain in the cervical spine. *Id.* at 681. Dr. Brownfield also found that Plaintiff had pain in the

bilateral knees and wrists. *Id.* Plaintiff was diagnosed with bilateral shoulder pain post-surgery, left knee pain post-surgery, cervical pain due to osteoarthritis, and CTS post-surgery, with continued pain and numbness in the left hand and wrist. *Id.* at 683. Dr. Brownfield determined that Plaintiff had severe limitations with regard to her neck, shoulders, left knee, and left hand. *Id.*

On July 30, 2015, a cervical spine MRI study revealed multilevel DDD of the cervical spine, which appeared stable, and some cystic areas deep to the thyroid. *Id.* at 687-88. On August 24, 2015, Dr. Richard Blake Chitsey, M.D., Plaintiff's primary care physician, wrote a letter stating that he felt that Plaintiff was unemployable due to depression, anxiety, migraines, herniated disc, post-traumatic stress disorder, and CTS. *Id.* at 689. Then, on August 27, 2015, Plaintiff returned to Dr. Knox and complained of pain and soreness that radiated from her neck, down to her shoulder, and then into her hand. *Id.* at 697-98. An X-ray of the cervical spine showed slight decreased disc space at C6-7. *Id.* at 698. Dr. Knox also noted that the MRI revealed a very large disc bulge at C6-7, as well. *Id.* Dr. Knox concluded that Plaintiff's problems were emanating from her cervical spine, and he recommended a neurosurgical evaluation. *Id.*

The ALJ officially denied Plaintiff's request for disability benefits on November 3, 2015. (Doc. 1-1). A week later, on November 10, 2015, Plaintiff reported to Dr. Knox that she was experiencing continued pain after falling and twisting her left knee about two-and-a-half weeks prior. (Doc. 10, pp. 699-700). Dr. Knox ordered a left knee MRI study, and then diagnosed Plaintiff with internal derangement of the left knee consistent with a medial meniscus tear. *Id.* at 700.

On November 13, 2015, a left knee MRI study revealed that Plaintiff had no definite acute abnormality and no internal derangement. *Id.* at 701-03. The study also showed small joint effusion, bilateral meniscal degeneration, bilateral joint space compartment narrowing, a moderate size posterior popliteal cyst, and a bone lesion along the lateral or fibular side of the intercondylar notch. *Id.* at 701-02. In comparison to a previous MRI study dated February 24, 2012, these changes to Plaintiff's knee likely were due to degenerative or arthritic developments that significantly worsened since the previous study. *Id.* at 701. Dr. Knox made a diagnosis that Plaintiff's left knee MRI study showed primarily degenerative arthritis, but because Plaintiff was only 42 years of age, she was too young to consider total knee arthroplasty. *Id.* at 704-05. Dr. Knox therefore recommended a Visco supplementation injection for the left knee. *Id.* at 705.

## II. LEGAL STANDARD

In the case at bar, the Commissioner found that Plaintiff was not entitled to receive disability benefits. This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). The Court must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a

contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the Court must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if the Commissioner reaches the final step in the analysis does she

consider the plaintiff's age, education, and work experience in light of the plaintiff's residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982) (en banc) (abrogated on other grounds); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III. DISCUSSION

Plaintiff raises essentially one issue on appeal: whether the ALJ properly evaluated the combined effects of her physical impairments. While the Court finds substantial evidence to support the ALJ's determination regarding Plaintiff's mental impairments and her mental RFC, the Court cannot agree with the Commissioner that the same is true of Plaintiff's physical impairments, particularly when taken in combination, and for this reason finds that remand is necessary.

The ALJ must consider the impairments in combination and not fragmentize them in evaluating their effects. *Delrosa v. Sullivan*, 922 F.2d 480, 484 (8th Cir. 1991), citing *Johnson v. Sec'y of Health & Human Servs.*, 872 F.2d 810, 812 (8th Cir. 1989). The Social Security Act specifically requires the Commissioner to consider all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling. *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

In the present case, the ALJ was obligated to consider the combined effect of Plaintiff's physical and mental impairments. The Court finds that the ALJ failed to evaluate the Plaintiff's impairments in combination when making his RFC determination. The ALJ ultimately concluded that Plaintiff could perform the requirements of sedentary work with the additional physical limitation of only occasional overhead reaching. (Doc.

10, p. 66). Further, the ALJ found that Plaintiff could perform the requirements of representative occupations, such as document preparer, escort vehicle driver, and small product assembler. *Id.* at 74. However, Plaintiff contends that sedentary work is inherently hand-intensive, and considering her impairments in combination, she is precluded from doing even sedentary work at this exertional level.

Plaintiff is correct that the ALJ's RFC determination did not properly consider the evidence relating to her diagnosis of CTS, including the postural and manipulative limitations she presented. Plaintiff had reported a history of CTS prior to the alleged disability onset date. (Doc. 10, p. 654). Then, Dr. Knox diagnosed Plaintiff with left CTS with EMG/NCS confirmation, and on February 11, 2015, he performed an endoscopic carpal tunnel release of the left hand. *Id.* at 691-95. Plaintiff's post-surgical visit with Dr. Knox two weeks later showed some signs of improvement, but she complained of chronic neck and arm pain shortly thereafter, and another EMG/NCS was ordered on May 8, 2015. *Id.* at 657-61, 696. Dr. Deimel opined that the findings from this EMG/NCS could indicate negative after-effects of Plaintiff's CTS, even after her surgery. *Id.* at 660.

On June 23, 2015, Dr. Al-Khatib recommended further EMG/NCS testing for Plaintiff's upper and lower extremities bilaterally, and he found that Plaintiff had moderate limitations on carrying and handling objects. *Id.* at 685-86. Three days later, Dr. Brownfield diagnosed Plaintiff with CTS status post-surgery, with continued pain and numbness in her left hand. *Id.* at 683. Dr. Brownfield diagnosed Plaintiff as having severe limitations with regard to her left hand. *Id.* And on August 24, 2015, Dr. Chitsey

wrote a letter opining that Plaintiff was unemployable, and citing her CTS as a reason. *Id.* at 689.

In addition to Plaintiff's CTS condition, which appears to limit the mobility of her left hand, she also suffers from cervical spine impairments that limit her manipulative and postural capabilities and prevent her from engaging in work that would require her to maintain certain head and neck position for long periods of time. Objective testing supports limitations on Plaintiff's functioning that go well beyond the ALJ's RFC finding. For example, on February 12, 2015, Plaintiff's cervical spine MRI study revealed moderate cervical spondylosis, with the worst level at C6-C7; moderate central disc osteophyte complex at C5-C6; and a small left-sided osteophyte complex at C4-C5. *Id.* at 661-63. On April 22, 2015, due to Plaintiff's severe bilateral posterior neck pain, Dr. Weilert diagnosed her with cervical stenosis and cervical radiculopathy, and he administered a cervical epidural steroid injection. *Id.* at 667-69.

On July 30, 2015, an updated cervical spine MRI study revealed multilevel DDD of the cervical spine. *Id.* at 687-88. Plaintiff's continued complaints of pain compelled Dr. Knox to recommend that she obtain a neurosurgical evaluation. *Id.* at 697-98. Dr. Knox emphasized at the time that the cervical spine MRI study revealed a very large disc bulge at C6-7, and he opined that Plaintiff's radiating pain was likely due to the cervical spine impairment. *Id.*

During Dr. Al-Khatib's examination, there was evidence of tenderness over the cervical spinal regions. *Id.* at 685-86. Dr. Al-Khatib also diagnosed Plaintiff with possible cervical radiculopathy. *Id.* Dr. Brownfield observed a reduced range of motion and pain in the cervical spine. *Id.* at 679-83. Dr. Brownfield also diagnosed Plaintiff

with cervical pain due to osteoarthritis and found that Plaintiff suffered from severe neck limitations. *Id.* at 683. Finally, Dr. Chitsey cited Plaintiff's herniated disc as an impairment that contributed to her inability to work. *Id.* at 689.

When determining Plaintiff's RFC, the ALJ also failed to consider the other functional limitations that could arise from Plaintiff's left knee impairment, and the fact that this left knee impairment could adversely affect her ability to perform aspects of sedentary work. The record shows that Plaintiff's left knee problem failed to be controlled by anti-inflammatories, pain medication, and a steroid injection, and as a result, Dr. Sidani performed a left knee arthroscopy. *Id.* at 428-29, 432-33, 502, 506-08. Unfortunately, Plaintiff still experienced extreme knee pain post-surgery. *Id.* at 427, 442, 509-11. Dr. Armstrong even recommended that Plaintiff seek a second orthopedic opinion because her knee pain reportedly had not abated since the surgery. *Id.* at 442.

Dr. Al-Khatib determined that Plaintiff had an antalgic gait at the consultative examination. *Id.* at 685-86. Dr. Al-Khatib also opined that Plaintiff had moderate standing and walking limitations. *Id.* Dr. Brownfield found that Plaintiff experienced pain in the bilateral knees when performing range-of-motion activities, and Plaintiff was subseqently diagnosed with left knee pain post-surgery. *Id.* at 679-83. Dr. Brownfield's opinion was that Plaintiff suffered from severe left knee limitations. *Id.*

After the ALJ issued his decision on November 3, 2015, a left knee MRI study administered the same month supported a diagnosis of degenerative arthritis with arthritic changes that appear to have significantly advanced since a previous study done on February 24, 2012. *Id.* at 61-74, 701-03. Dr. Knox found that Plaintiff was too young

15

to consider a total knee arthroplasty and recommended that she have a Visco injection for the time being. *Id.* at 704-05.

The Court finds that the ALJ assigned little weight to the consultative assessments made after Dr. Brownfield's general physical examination and Dr. Al-Khatib's neurological evaluation. *Id.* at 72, 679-86. The ALJ also discounted the opinion of Plaintiff's treating primary care physician, Dr. Chitsey, who opined that Plaintiff was unemployable due to herniated disc and CTS, among other disorders. *Id.* at 72, 689. In light of the medical evidence detailing Plaintiff's CTS, left knee problems, and cervical spine issues considered in combination, the Court cannot agree with the ALJ's evaluation of the medical record. Therefore, this matter must be reversed and remanded for further proceedings.

On remand, the ALJ is directed to specifically reconsider Drs. Al-Khatib and Brownfield's consultative opinions, as well as Dr. Chitsey's treating source opinion, with respect to postural and manipulative limitations. The ALJ is also instructed to contact Dr. Knox, Plaintiff's treating orthopedic surgeon, and recontact Drs. Al-Khatib, Brownfield, and Chitsey, to seek clarification regarding Plaintiff's postural and manipulative limitations. With this additional medical opinion evidence, the ALJ should then reconsider the Plaintiff's RFC.

## V. CONCLUSION

For the reasons set forth above, the Court concludes that the ALJ's decision is not supported by substantial evidence. The denial of benefits is therefore **REVERSED**, and the matter is **REMANDED** to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED** on this 16th day of February, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE